GUISTI et al. v. GALVESTON TRIBUNE.

(Supreme Court of Texas. Nov. 13, 1912.)

1. LIBEL AND SLANDER (§ 15*) — LIABILITY UNDER STATUTE—WORDS ACTIONABLE—"LIBEL."

Rev. Civ. St. 1911, art. 5595, defining a libel as a defamation expressed in printing or writing tending to injure the reputation of a person and expose him to public hatred, contempt, or ridicule, or to impeach his honesty, integrity, or virtue, modifies the common-law rule as to libel and slander, and a publication is libelous whether it is libelous per se or not; it being sufficient if it can be shown by innuendo that the matter imputed had the tendency described in the statute and had reference to the plaintiff.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1; Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 5, pp. 4116–4125.]

2. LIBEL AND SLANDER (§ 4*)—LIABILITY UNDER STATUTE—MALICE.

Such statute also changed the common-law rule with respect to proof of malice, where a publication is not libelous per se, and recovery may be had under the statute for a publication not libelous per se where the publication has the effect contemplated by the statute, though there is no proof of malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 111; Dec. Dig. § 4.*]

3. LIBEL AND SLANDER (§ 15*) — LIABILITY UNDER STATUTE—SPECIAL DAMAGES.

Under such statute it is not necessary to prove special damages from a publication having the effect contemplated by the statute, though the publication is not libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1; Dec. Dig. § 15.*]

4. LIBEL AND SLANDER (§ 119*)—LIABILITY UNDER STATUTE—DAMAGES—MENTAL SUFFERING.

Under such statute recovery may be had for mental anguish resulting from a publication not libelous per se without proof of other injury or damage.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 347; Dec. Dig. § 119.*]

5. LIBEL AND SLANDER (§ 15*) — WORDS ACTIONABLE.

A newspaper article reciting that a barroom in a grocery store near a medical school was in operation; that a young woman, the daughter of the proprietor and his assistant, was found behind the bar, and stated that sales had been made to students in violation of law, but that the sales were made without knowledge that the buyers were students and that the place had been complained of, and that it was understood that students inclined to patronize such places were attracted there for some reason, was libelous, under the statute, as tending to subject her to public contempt or impeach her integrity, virtue, or reputation.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1; Dec. Dig. § 15.*]

6. LIBEL AND SLANDER (§ 15*) — LIABILITY UNDER STATUTE—ACCUSATION OF CRIME.

Liability may arise under the statutes though the matter imputed by the publication does not constitute the commission of a crime in the sense of violating the penal laws of the state; it being sufficient that the publication has the effect described in the statute.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1; Dec. Dig. § 15.*]

7. LIBEL AND SLANDER (§ 97*)—WORDS ACTIONABLE—PETITION—DEMURRER.

In testing the general demurrer to a petition in an action for libel, it will be presumed that the charge made against plaintiff was untrue, and that she was a person of good reputation.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 234–236; Dec. Dig. § 97.*]

8. LIBEL AND SLANDER (§ 7*)—WORDS ACTIONABLE—IMPUTATION OF UNCHASTITY.

A false publication to the effect that a female acted as barmaid at a saloon during the absence of the proprietor, and that for some reason or other students resorted to such place, and that the female stated that "they were there to do business," imputed unchastity to such female and was libelous.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 17–78; Dec. Dig. § 7.*]

9. LIBEL AND SLANDER (§§ 123, 124*) — LIBELOUS LANGUAGE — QUESTION FOR COURT AND JURY.

Where the alleged defamatory language is ambiguous or of doubtful import, the court must define a libel and leave to the jury the question as to whether the language is libelous, but, where the publication admits of no ambiguity, the court may dispose of the question by determining the reasonable and natural meaning of the publication.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364, 365–373; Dec. Dig. §§ 123, 124.*]

10. LIBEL AND SLANDER (§ 19*) — PUBLICATIONS—CONSTRUCTION.

In determining the meaning of an alleged defamatory publication, the question is as to the effect of the publication on the minds of the ordinary reader.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 98, 99; Dec. Dig. § 19.*]

11. LIBEL AND SLANDER (§ 125*) — GENERAL VERDICT—SPECIAL DAMAGES.

Where, in an action for libel, the court instructed that, in case the jury believed the publication charged plaintiff with unchastity, they might find special damages, and that, if they did not find special damages resulting to plaintiff by reason of the imputation, they should find for defendant unless they found for plaintiff on other issues, a finding of general damages only did not necessarily imply that the jury found against the charge of unchastity, for they might have found that the article impeached plaintiff's virtue, but that no special damages resulted therefrom.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 374; Dec. Dig. § 125.*]

12. LIBEL AND SLANDER (§ 12*)—IMPUTATION OF UNCHASTITY—LIABILITY.

A woman libeled by imputation of unchastity may recover without proof of special damages.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 97; Dec. Dig. § 12.*]

Error to Court of Civil Appeals of First Supreme Judicial District.

Action by Pietrina Guisti and another against the Galveston Tribune. There was a judgment of the Court of Civil Appeals (134 S. W. 239), reversing a judgment for plaintiffs and rendering a judgment for defendant, and plaintiffs bring error. Judgment of Court of Civil Appeals reversed, and judgment of trial court affirmed.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Marsene Johnson, Geo. G. Clough, and Aubrey Fuller, all of Galveston, for plaintiffs in error. Wm. B. Lockhart, of Galveston, for defendant in error.

DIBRELL, J. This suit was brought in the district court of Galveston county on June 14, 1909, by Pietrina Guisti, at the time an adult unmarried woman, against the Galveston Tribune, a private corporation, to recover damages alleged to have been incurred by reason of a certain publication made in the columns of the Galveston Tribune a daily paper published and circulated in the county of Galveston and in other portions of the state. Pending the suit, plaintiff intermarried with Amerigo Collucci, who was made a party plaintiff pro forma. The cause of action was based upon the following publication, to wit: "As stated in the Tribune Friday evening, one of the first licenses issued by the city since Aug. 1st for the conducting of a corner grocery saloon within the residence section prohibited by the districting ordinance was to T. Guisti to sell liquor at 902 Mechanic street. One of the main objections to this saloon previous to the passing of the ordinance was its close proximity to the State Medical College, and the allegation that the proprietor of the place violated the provisions of the Baskin-McGregor Law [Acts 30th Leg. c. 138] and the conditions of his bond by selling liquor to students. With the reopening of the barroom the complaints to the dean of the college have been again renewed and a personal investigation of the place by a representative of this paper this morning revealed the following facts: The place is open as usual for business, and when the reporter called, liquor was being sold over the bar, together with lunch, in fact at the time a man was standing at the bar drinking a bottle of porter and eating a sandwich. The proprietor of the place was not present, but a young woman behind the bar, in answer to the question as to whether or not students were patrons of the place, stated in an excited way that 'she was going to tell Dr. Carter to put bells around the necks of the students, so they could tell who they were.' 'When we ask young men if they are students, they get mad and tell us that it is none of our business. We can't tell, and we are here to do business.' Asked if there had been any sales to students since the place reopened, she admitted that there had been and that it took place on Saturday morning. 'Two young men came in and asked for some wine. They told me they were not students, and I sold them what they wanted; and after they had drank it they said they were students and laughed.' On the door leading from Ninth street into the barroom annex, on the wall facing the door, and behind the bar, are signs printed by hand on white cardboard with the following words: 'No liquors of any kind sold here to students.' The young woman pointed to these signs and stated that they were put there on Saturday evening for the students to read themselves when they came in. Asked if she was not familiar with the provisions of the law regulating such sales, and that dealers are supposed to know whether customers are students or not, she answered 'that she did not know for sure,' but that 'they did not want to sell to students.' It is set forth in all liquor dealers' bonds, among other things, that the bond is conditional that the principal, agent or employé will not sell or permit to be sold or given away any spirituous, vinous or malt liquors, or medicated bitters to a student of any institution of learning.' It is also stated by legal authorities that ignorance of this law or of the fact that the dealer or employé cannot tell that a student is does not in any manner excuse; they are supposed to know their customers, and in case of doubt to take the safe course and refuse to sell. The place named above has been complained of, and it is understood from neighbors that the students inclined to patronize such places are attracted there for some reason. On two of the opposite corners are located corner groceries which formerly had bar annexes, but neither of them have as yet renewed their licenses. A woman in charge of one of the places stated this morning that she did not intend to take out a license, as she realized that the time was short when the place would be allowed to exist, and she was satisfied to continue her other business without beer."

Plaintiff's petition contains all the allegations essential to establish her cause of action against the defendant for damages for the publication of a libel, unless the publication aided by pertinent innuendoes fails to constitute libel as it is defined by the statutes of this state. The allegations of innuendo made in aid of the charge of libel summarized are that the "young woman" referred to in the publication meant and was by defendant intended to mean plaintiff; that the words, "The proprietor of the place was not present, but a young woman behind the bar, in answer to the question as to whether or not students were patrons of the place, stated in an excited way that 'she was going to tell Dr. Carter to put bells around the necks of the students, so they could tell who they were.' 'When we ask young men if they are students, they get mad and tell us that it is none of our business. We can't tell, and we are here to do business.' Asked if there had been any sales to students since the place reopened, she admitted that there had been, and that it took place on Saturday morning. 'Two young men came in and asked for some wine. They told me they were not students, and I sold them what they wanted; then after they had drank it they said they were students, and laughed,' " defendant meant and

intended to mean and published that the plaintiff was behind the bar, meaning the barroom; and that defendant thereby meant and intended to mean and publish that plaintiff was offering for sale and selling and had sold intoxicating liquor in a barroom to students of an institution of learning in violation of law and that she was a common barmaid. That by the use of the language in said publication, "The place named above has been complained of, and it is understood from neighbors that the students inclined to patronize such places are attracted there for some reason," defendant meant as an addition to other matters quoted that plaintiff was used by her father as a barmaid in said barroom for the purpose of attracting medical students and other persons there for patronage; and meant, and was intended to mean, by the defendant, that plaintiff was a person of loose morals and a person addicted to lascivious conduct and that she (this plaintiff) was an attraction placed in said barroom by her father to entice and attract said medical students and other persons into said barroom; and that said published words meant, and were by defendant intended to mean, that this plaintiff was an unchaste woman.

The insinuations alleged to be deducible from the publication that plaintiff was a barmaid engaged in the illegal sale of intoxicating liquors and a person of loose virtue were alleged to have caused damages, general and special, in the following language: "The published statement of defendant that plaintiff was a barmaid, serving and selling intoxicating liquors in a common barroom, caused her to lose the respect and esteem of her neighbors and acquaintances in the community in which she lives; and that said published statement of defendant that she (said plaintiff) was aiding, abetting, and conniving at violations of the law regulating the sale of intoxicating liquors in the state of Texas impeached her integrity and caused an ill opinion of her in the community in which she lives, and caused her to sustain damages by reason of the injury to her reputation as a woman of integrity, good conduct, and good demeanor in the community in which she lives, and caused her to suffer much mental anguish and humiliation. * * * And caused her to sustain special injury and damages to her reputation as a woman of good morals, good conduct, good propriety, and virtue, and caused her to suffer much mental pain, agony, distress of mind, and humiliation, and degraded her in the community in which she lives." To the sufficiency of plaintiff's petition the defendant interposed general and special exceptions, which raised the question whether or not the publication aided by the innuendoes as set out herein constituted libel. These exceptions were overruled by the trial court and the cause submitted to a jury, which returned a verdict for plaintiff for $5,000 general damages. Upon an appeal of the case by the defendant below to the Court of Civil Appeals at Galveston, that court on January 14, 1911, reversed the judgment entered in favor of plaintiff in the lower court, and rendered judgment for the defendant below. See opinion in cause of Galveston Tribune v. Guisti et al. (Civ. App.) 134 S. W. 239. The cause is in this court upon writ of error prosecuted by the plaintiff below.

The first error assigned as ground for the writ of error presents the question whether or not the publication declared on, in connection with the innuendoes, constitutes a libel. It was held by the Court of Civil Appeals that it did not, and that the general demurrer to plaintiff's petition should have been sustained, and that it was not possible by any proper innuendoes to make the publication libelous. In this we are clearly of the opinion there was error.

Article 5595, Revised Civil Statutes 1911, defines libel as follows: "A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings, tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury."

[1] By the express terms of the article of the statute above quoted, in so far as it relates to the case at bar, any written or printed publication tending to injure the reputation of any person alive and thereby exposing him to public hatred, contempt, or ridicule, or tending to impeach the honesty, integrity, virtue, or reputation of such person, is a libel. It then becomes pertinent to inquire whether there is anything in the language used in the publication complained of that tends to injure the reputation of plaintiff and which would expose her to public hatred, contempt, or ridicule, or which tends to impeach her honesty, integrity, virtue, or reputation. It is immaterial that the publication complained of is not libelous per se; it is libelous and actionable, nevertheless, if by such innuendoes as may not extend, but simply explain, the effect and meaning of the language used and the identity of the person libeled, the publication is of such character as tends to injure the reputation of plaintiff and expose her to public hatred, contempt, or ridicule, or tends to impeach her honesty, integrity, virtue, or reputation.

We are unable to agree to the proposition as stated by the Honorable Court of Civil Appeals in this case that "this statute does not enlarge the common-law definition of libel as previously understood and declared by our courts, and manifestly its purpose was only to fix certainly and clearly by statute a definition which might not be changed or

modified by the courts to meet the supposed justice of a particular case." We think it clear that, in the enactment of the law, the purpose was not only to make definite what constitutes actionable libel in this state, but to materially modify the doctrine of the common law upon that subject.

[2] By the terms of the present law, a libelous publication, contrary to the common law rule, becomes actionable without the proof of malice, whether it is or not libelous per se.

[3] Under the present law, it is not necessary to the right to maintain an action for a publication not libelous per se to allege or prove special damages. Walker v. San Antonio Light Pub. Co., 30 Tex. Civ. App. 165, 70 S. W. 557. In this particular the common-law rule has been modified.

[4] Again, at common law, where the libel was not actionable per se, damage for mental anguish was recoverable, if at all, only when proof had been made of other injury or damage, but the contrary is the rule under the present law. So that we are constrained to hold with Judge Key, as in the case of Walker v. San Antonio Light Publishing Co., above cited, that the manifest purpose of the Legislature in enacting this law was to cover the entire subject of libel as applied to civil actions, without regard to the rules of the common law and holdings of the courts on the subject, and to materially enlarge the rights of those who may be the subject of libelous publications.

Prior to the act of the Twenty-Seventh Legislature, we had no statutory law upon the subject of civil actions for libel except those relating to the questions of limitation and jurisdiction and such penal statutes as created offenses growing out of libel and slander. The common law upon the subject was the sole guide except in so far as the common-law doctrine was held to have been changed or modified by the penalization by legislative act of certain written publications and oral utterances. Before the holding of Judge Brown in the case of Hatcher v. Range et ux., 98 Tex. 85, 81 S. W. 289, the law of this state prescribed by the common law held that the imputation of unchastity in a woman was not actionable per se, and could only be sustained upon the allegation and proof of special damages. In the Hatcher Case Judge Brown, with his profound sense of justice, propriety, and the correct legal effect to be given the penal statute making it a penal offense to "falsely and maliciously or falsely and wantonly" impute to a female want of chastity, held such imputation of unchastity gave a civil action for damages without showing special damages arising therefrom. This decision was not the result of the exigencies of the case but in response to a proper interpretation of the law. But, irrespective of the Penal Code, the present statutory law makes any printed or written statement tending to impeach the virtue of any person in this state actionable as a libel, without regard to the allegation or proof of special damages.

[5] The claim that the publication in effect charged plaintiff with being a barmaid engaged in conducting a barroom, and illegally selling intoxicating liquors to students of the Medical University, is in our judgment fully sustained by the context of the article. The sale of intoxicating liquors to students being prohibited by law, and subjecting the person guilty of violating such provision of the law to the payment of heavy penalties and the forfeiture of the license to longer engage in such business lawfully conducted, is a defamatory publication tending to bring the person thus libeled into public contempt, and impeaches his integrity and reputation as a law-abiding and worthy citizen.

[6] It is immaterial that the article did not charge plaintiff with the commission of crime in the sense of violating the penal laws of this state, for it is no longer essential to constitute a publication libelous that it should charge an offense denounced by the Penal Code of the state or by the common law, but it is sufficient if the written or printed defamation tends to subject plaintiff to public contempt or impeaches her integrity or reputation.

[7] In testing the general demurrer, it is assumed the charge made against plaintiff was untrue and that she was a person of good reputation. Just how a young woman of good reputation and social standing, charged with being a bartender or barmaid and conducting such business in a manner to subject the proprietor of the saloon to the liability of paying heavy penalties and forfeiting his license, could withstand this imputation and retain the esteem and respect of her neighbors and acquaintances and possess her good reputation is not to us conceivable. Under the circumstances set forth in the publication and the facts alleged, this portion of the article constituted a libel upon plaintiff and gave her a cause of action independent of any other charge.

[8] After stating that the proprietor was absent, and finding a young woman behind the bar engaged in conducting the liquor business and selling to students of the Medical University in violation of law, the article proceeds to say: "The place named above has been complained of, and it is understood from neighbors that the students inclined to patronize such places are attracted there for some reason." By innuendo it is claimed this portion of the publication called into question the womanly integrity of plaintiff and is an impeachment of her virtue. The Court of Civil Appeals hold that "such an inference from this language is wholly unreasonable," but we are inclined to the opposite view. Considering all the references to plaintiff and the attitude in which she is placed by the article as a young

woman behind the bar announcing that "they were there to do business," it is difficult to put any other construction upon the meaning of the words complained of than that charged in the innuendo. The natural inference from the language of the article above set out is that the neighbors of plaintiff have complained of the place, and not because intoxicating liquors are being sold to students, but because for some reason students inclined to patronize saloons are attracted to this particular place. The first thought that would naturally suggest itself to the ordinary reader would be, Why are students who are inclined to patronize saloons attracted to the corner place of Guisti? Why should the neighbors to this corner grocery be interested in the fact that students were sold intoxicating liquors there, further than to entertain a contempt for the person engaged in so violating the law? But it would be perfectly natural for neighbors to complain if students were attracted to the place by reason of a young woman of loose virtue. In this they would have the incentive of preserving the decency of their locality and the example set for their boys and girls.

[9] But whatever view may be taken of the language used, if its meaning is ambiguous and of doubtful import, as is conceded by the Court of Civil Appeals, the proper practice was to submit the question to the jury, which was done. Under such circumstances, it was not proper for the court to dispose of the matter by determining what was the reasonable and natural meaning of the statement. That is the court's duty in those cases where the publications admit of no ambiguity, but, where such ambiguity exists in the language complained of, it is the court's duty to define libel and leave to the jury the question as to whether the language is libelous. Cotulla v. Kerr et al., 74 Tex. 89, 11 S. W. 1058, 15 Am. St. Rep. 819.

[10] The learned Chief Justice of the Court of Civil Appeals, in discussing this feature of the case, says: "The question is not what construction the witnesses in the case may put upon the statement, but what is its reasonable and natural meaning in view of the facts and circumstances under which it was made as alleged in the petition." We think the contrary is the rule in this state. In rendering the opinion in the case of Belo & Co. v. Smith, 91 Tex. 225, 42 S. W. 851, Chief Justice Gaines makes clear our position in the following statement: "The question is, what effect would the publication have upon the mind of the ordinary reader? What construction would he have put upon it? For in defamatory language, it is not so much the idea which the speaker or writer intends to convey, as what he does in fact convey. It is the effect upon the character of the person alleged to be de-

famed by the utterances which the law considers, and therefore the utterer uses the language at his peril."

[11] In regard to the finding by the jury of general damages only, we do not think this finding indicated that the jury found against plaintiff upon the issue that the publication charged her with a want of chastity. The jury were told by the court's charge that, in case they believe the publication charged plaintiff with unchastity, they might find special damages, and that, if they did not find special damages resulting to plaintiff by reason of the imputation of unchastity, they should find for the defendant, unless they found for plaintiff on the other issue, but a finding by the jury of general damages only does not necessarily imply that they found against the charge of unchastity. They might have found the article impeached plaintiff's virtue, but that no special damages resulted therefrom.

[12] The charge of the court to the effect that plaintiff could not recover where she had been libeled by the imputation of unchastity unless she sustained special damages was clearly error. This has not been the law of this state since the Hatcher Case above cited. There is nothing in the present law to warrant such a holding.

We have examined the record and find that there is nothing in the manner of the presentation of the case to the jury of which the defendant can justly complain, and that the evidence is sufficient to sustain the finding of the jury.

The judgment of the Court of Civil Appeals will therefore be reversed, and that of the lower court affirmed, and it is accordingly so ordered.